Charles M. Tebbutt (WSBA #47255)
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence Street
Eugene, OR 97401
Tel: (541) 344-3505
Fax: (541) 344-3516

*Counsel for Plaintiffs*

Patrick Ryan (WSBA #25499)
Meredith Weinberg (WSBA #45713)
Perkins Coie LLP
1201 Third Avenue #4900
Seattle, WA 98101
Tel:  (206) 359-8000
Fax:  (206) 359-9000

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COMMUNITY ASSOCIATION FOR THE RESTORATION OF THE ENVIRONMENT, a Washington nonprofit corporation, FRIENDS OF TOPPENISH CREEK, a Washington nonprofit corporation, and CENTER FOR FOOD SAFETY, a Washington, DC nonprofit corporation<br><br>              Plaintiffs,<br><br>    v.<br><br>SUNNYSIDE DAIRY, LLC.<br><br>            Defendant. | Case No. 1:20-CV-3128-TOR<br><br>**CONSENT DECREE** |

**CONSENT DECREE** - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# **TABLE OF CONTENTS**

| | | |
|---|---|---|
| A. | General Provisions | 5 |
| B. | Manure Storage Lagoons and Emergency Overflow Basins | 7 |
| C. | Groundwater Well Installation and Monitoring | 12 |
| D. | Stormwater Engineering | 15 |
| E. | Cow Pen Maintenance | 16 |
| F. | Silage Areas | 16 |
| G. | Compost Areas | 17 |
| H. | Wet Manure Storage Area | 18 |
| I. | Manure Application and Field Management | 19 |
| J. | Underground Conveyance Inspections | 30 |
| K. | Clean Drinking Water Project Funding | 30 |
| L. | Site Inspections | 32 |
| M. | Fees and Costs | 33 |
| N. | Other Terms and Conditions | 35 |
| O. | Release and Covenant Not to Sue | 36 |
| P. | Force Majeure | 37 |
| Q. | Integration | 38 |
| R. | Modification | 39 |
| S. | Retention of Jurisdiction and Dispute Resolution | 39 |
| T. | Termination | 39 |
| U. | Notice | 40 |
| V. | Effective Date and Final Judgment | 41 |

# **EXHIBITS**

| | |
|---|---|
| Exhibit 1: | Aerial Photograph/Map |
| Exhibits 2a, 2b, 2c: | Application Fields Maps (Main Dairy Fields, Airport Fields, Port Fields) |
| Exhibit 3: | Lagoon and Basin Basis of Design Report |
| Exhibit 4: | Monitoring Well Installation and Groundwater Monitoring Plan |
| Exhibit 5: | Stormwater Engineering Plan |
| Exhibit 6: | Cow Pen Maintenance Plan |
| Exhibit 7: | Silage Area Drainage Improvements |
| Exhibits 8A-8B: | Upper Compost Area Improvements; Lower Compost Area Improvements |

**CONSENT DECREE** - 2

Exhibit 9:                    Compost Operations Plan
Exhibit 10:                   Soil moisture sensors maps
Exhibit 11:                   Records Defendant shall provide pursuant to
                              Paragraph 61
Exhibit 12:                   Three-mile radius downgradient of the Dairy
Exhibit 13:                   Engineering Water Balance


**\*\*\*<u>EXHIBITS 1 THROUGH 13 ARE ON FILE HEREIN AND
FILED AT ECF NOS. 2-2 THROUGH 2-14 AND ARE HEREBY
INCORPORATED IN FULL BY THIS REFERENCE.  Signed
Thomas O. Rice, United States District Judge.</u>\*\*\***

**CONSENT DECREE** - 3

WHEREAS, the Plaintiffs, Community Association for Restoration of the Environment, Inc. ("CARE"), Friends of Toppenish Creek, and Center for Food Safety (together, the "Plaintiffs"), filed a Complaint simultaneously with this Consent Decree against Sunnyside Dairy, LLC ("Defendant" or "Sunnyside") (the "Parties" collectively or a "Party" in the singular), alleging violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. ("RCRA"), and seeking declaratory and injunctive relief, civil penalties and attorneys' fees and costs; and

WHEREAS, Plaintiffs' claims and this Consent Decree relate to the dairy operations and facilities that are the subject of the Complaint and 90-Day Notice of Intent ("90-Day Notice") filed in this action; and

WHEREAS, Defendant denies Plaintiffs' claims, allegations, and any liability for the alleged violations; and

WHEREAS, Plaintiffs and Defendant agree that settlement of these matters is in the best interest of the Parties and the public, and that entry of this Consent Decree without additional litigation is the most appropriate means of resolving this action; and

WHEREAS, Plaintiffs and Defendant, after consultation with their respective counsel and without trial or final adjudication of the issues of fact or law with respect to Plaintiffs' claims or allegations, consent to the entry of this Decree in order to avoid the risks of litigation and to resolve the controversy between them;

NOW, THEREFORE, without trial of any issue of fact or law, and without admission by Defendant of the facts or violations alleged in the Complaint or the 90-Day Notice, and upon consent of the Parties, and upon

**CONSENT DECREE** - 4

consideration of the mutual promises herein contained, it is hereby
ORDERED, ADJUDGED AND DECREED as follows:

### A.  <u>General Provisions</u>

1.     This Court has jurisdiction over the Parties and subject matter
of this action pursuant to 42 U.S.C. § 6972 and 28 U.S.C. § 1331.

2.     Venue is proper in this Court pursuant to 42 U.S.C. § 6972(a),
and 28 U.S.C. § 1391(b) and § 1395(a).

3.     The undersigned representative for each Party certifies that
he/she is fully authorized by the Party or Parties whom he/she represents to
enter into the terms and conditions of this Decree and to legally bind the
Party or Parties to it.

4.     Located in the Sunnyside area of Eastern Washington,
Defendant is comprised of three adjacent dairies, known as the "Little
Dairy", the "Upper Dairy," and the "Lower Dairy" (as shown in Exhibit 1)
and meets the federal and state law definitions of a large concentrated
animal feeding operation.  Defendant's office is located at 4581 Maple
Grove Road, Sunnyside, WA  98944.

5.     For this Decree, the term "Dairy" shall refer to (1) the
operational and process facilities, including manure storage lagoons, as
shown in the map on the aerial photograph attached as Exhibit 1 hereto
(hereafter the "Production Area" as defined in 40 CFR 122.23(b)(8)); and
(2) the manure application fields owned, leased, or otherwise controlled by
Defendant (hereafter the "Application Fields").  The term Application
Fields does not include any field on which Defendant or an affiliated entity
ceases manure application and which Defendant removes from its Dairy

**CONSENT DECREE** - 5

Nutrient Management Plan ("DNMP").  As of the date of this Decree, the Application Fields consist of the fields depicted in Exhibit 2a (known as the "Main Dairy Fields"), Exhibit 2b (known as the "Airport Fields"), and Exhibit 2c (known as the "Port Fields").  Collectively, the dairy activities conducted by Defendant within the Production Area and Application Fields are referred to herein as "Dairy Operations".

6.    This Decree shall apply to and be binding upon the Parties to this action, and upon the successors and assigns of the Parties.  This provision is intended to require full compliance with this Consent Decree so long as the Dairy is used by any affiliated person or entity in the course of conducting Dairy Operations at the Dairy; provided that nothing herein shall prevent Defendant from discontinuing its Dairy Operations, in whole or in part, at the Dairy, or from transferring any or all of the Dairy (including one or more of the Application Fields) to other entities for dairy operations or for uses other than for Dairy Operations.  Should any such discontinuance of Dairy Operations occur on any or all of the Dairy, this Decree shall no longer apply to any such portion of the Dairy that is not being used for Dairy Operations or other agriculturally-related operations that involve the application of manure produced by the Dairy Operations (i.e., one or more of the Application Fields).  Defendant, or any of its successors or assigns, may sell or otherwise transfer interest in the Dairy (including but not limited to one or more of the Application Fields, or any of the real property upon which the Dairy is situated or where Dairy Operations are conducted, in whole or in part), without Plaintiffs' consent and without approval of the Court; provided, however, that Defendant must

**CONSENT DECREE** - 6

provide a copy of this Decree to the new owner or transferee and provide written notice to Plaintiffs of the sale or other transfer of real interest within 30 days of closing.  The terms of this Decree run with the property for any Dairy Operations until satisfied.

7.      This Decree shall not constitute evidence in any proceeding, an admission or adjudication with respect to any allegation contained in the 90-day Notice or the Complaint, any fact or conclusion of law with respect to any matter alleged in or arising out of the 90-day Notice or the Complaint, or the admission or evidence of any wrongdoing, liability or misconduct on the part of the Defendant, or any of their directors, officers, employees or any affiliated entities or persons. This Decree shall not be admitted in any proceeding against a Party over that Party's objections, except for purposes of interpreting, modifying, and/or enforcing this Decree.

8.      Any paragraph or subparagraph heading or section title in this Decree is provided solely as a matter of convenience to the reader and shall not be construed to alter the meaning of any provision of this Decree.

**B.      Manure Storage Lagoons and Emergency Overflow Basins**

9.      Defendant may increase the depth of its eight (8) lagoons in order to increase storage volumes and support split winter manure application, based on the Engineering Water Balance (attached as Exhibit 13), in order to document the sufficiency of on-Dairy storage under operating conditions contemplated in this Decree.

10.      Defendant shall double line all eight (8) of its lagoons using two membrane liners with a leak detection sump and pump to remove

**CONSENT DECREE** - 7

leachate collecting between them, as set forth in the Lagoon and Basin Basis of Design Report attached hereto as Exhibit 3.

11.     Defendant shall complete design and submit permit applications to the relevant authorities for all lagoon lining activities required in Paragraph 10 no later than December 31, 2020. Plaintiffs shall not submit any adverse public comments on Defendant's State Environmental Policy Act submittals related to the lagoon lining.

12.     No later than December 31, 2021, Defendant shall complete the lining of the first of its eight (8) lagoons. During each subsequent calendar year from 2022 through 2028, Defendant shall complete the lining of at least one additional lagoon (i.e., one lagoon in calendar year 2022, one lagoon in calendar year 2023, etc.). Although Defendant shall be permitted to expedite the lining contemplated in this section, lining of all eight lagoons shall be completed no later than December 31, 2027.

13.     Defendant may abandon in place any lagoon that it chooses not to line, in the event such lagoon is not needed for storage capacity. Such abandonment shall include the removal or treatment of the abandoned lagoon bottom and side-wall soils containing greater than 45 mg N/kg (measured as the sum of ammonium-N and nitrate-N), and Defendant shall provide sampling data to Plaintiffs at the time abandonment is completed which documents that the bottom and side-wall soils of any abandoned lagoons contain less than 45 mg N/kg. Any such abandonment(s) shall be performed in accordance with the schedule in Paragraph 12 and any applicable requirements in the Concentrated Animal Feeding Operation permit (the "CAFO Permit") under which Defendant is operating, and any

**CONSENT DECREE** - 8

applicable requirements of Defendant's DNMP.  In the event that Defendant chooses to abandon a lagoon in a particular calendar year, such abandonment shall be treated as if Defendant met the annual lagoon-lining requirement in Paragraph 12 for that particular calendar year.

14.    Defendant may combine any lagoons to decrease overall storage costs.  In the event that Defendant chooses to combine two or more lagoons in a particular calendar year, such combination shall be treated as if Defendant lined one lagoon for that calendar year and one lagoon for the next calendar year, such that no lagoon lining shall be required in the calendar year subsequent to the combination (e.g., if two lagoons are combined in calendar year 2022, Defendant shall not be required pursuant to Paragraph 12 to line a lagoon in calendar year 2023).

15.    Defendant shall line the basin currently being used as an emergency overflow basin on the Lower Dairy (as detailed on the map included in Exhibit 1) with a single 60-mil HDPE liner, provided the basin is used for storage of manure or stormwater contacting the Production Area ("Process Wastewater") for more than 7 days in a row or 30 days cumulative during a single calendar year. If the basin is to be used for anything other than the limited Process Wastewater, as defined in the preceding sentence, then Defendant shall double-line the basin in the same manner required of the lagoons, as described in Exhibit 3.  If the basin needs to be lined in this manner, lining will be completed prior to the earlier of either (a) December 31, 2028 or (b) no later than one year after Defendant's use of the basin for something other than storage of Process Wastewater as defined herein.

**CONSENT DECREE** - 9

16.     No later than December 31, 2020, Defendant shall install an additional emergency earthen overflow basin adjacent to and southwest of the existing concrete collection sump at the Upper Dairy to provide contingent short-term (i.e., less than 7 days at a time and less than 30 days per year) stormwater and manure containment in the event of a power failure or other unforeseen system upset at the Upper Dairy.  The new basin shall be lined with a single 60-mil HDPE liner if the basin is used for storage of manure or Process Wastewater for more than seven (7) days in a row or thirty (30) days cumulative during a single calendar year. After installation, if this basin is used for something other than storage of manure or process wastewater, then it shall be double-lined as required of the lagoons, as described in Exhibit 3.  If the basin needs to be lined in this manner, lining will be completed prior to the earlier of either (a) December 31, 2028 or (b) no later than one year after Defendant's use of the basin for something other than storage of manure or process wastewater.

17.     Defendant shall provide Plaintiffs, in accordance with the Notice provisions in Paragraph 96 with an estimated schedule of its planned activities pursuant to Exhibit 3 prior to such activities being conducted.  The intent of that schedule notification is to facilitate construction observation by Plaintiffs. Recognizing that daily schedules may change due to contractor availability, weather conditions or other factors, Defendant shall use best efforts to keep Plaintiffs informed of schedule changes.

18.     Plaintiffs shall be permitted to observe and inspect Defendant's activities with respect to Paragraph 10 (observation of lining

**CONSENT DECREE** - 10

of lagoons); Paragraph 16 (observation of new emergency overflow basin); and Exhibit 3, in accordance with Section L below (Site Inspections).

19.    Defendant shall provide Plaintiffs, in accordance with the Notice provisions in Paragraph 96 with an as-built report following the lining or abandonment of each lagoon pursuant to this Section. Defendant shall provide the as-built report to Plaintiffs no later than 60 days after Defendant completes construction of such lining or abandonment of such lagoon.  For lagoons that are lined, the as-built report will include the following information:

a.    Survey of lagoon topography at the completion of soil work (excavation, fill, grading and compaction) prior to liner installation;

b.    Results of compaction test data including lagoon floor, slope, and sump;

c.    Final liner leak detection survey with all liner QA/QC data (i.e., results of puddle survey prior to filling of lagoon);

d.    As-built drawings with vent locations, sump details, sump shape and volume, and utility locations;

e.    Leak detection pump test data; and

f.    Reasonably detailed photographic documentation of each lagoon at six project milestones: beginning of construction; completion of earthwork; placement of secondary liner; installation of sump and piping; placement of primary liner; and project completion.

20.    No later than January 31 of each year beginning in 2021, Defendant shall provide Plaintiffs, in accordance with the Notice provisions in Paragraph 96, an annual written summary, prepared under the

**CONSENT DECREE** - 11

direction of a licensed engineer, of all work completed under this Section B.

### C.     Groundwater Well Installation and Monitoring

21.     In addition to its existing four (4) monitoring wells at the Dairy, Defendant shall install seven (7) new groundwater monitoring wells in the locations specified in the Monitoring Well Installation and Groundwater Monitoring Plan attached hereto as Exhibit 4.

22.     The seven (7) wells shall be installed with screens across the first water-bearing zone.

23.     The seven (7) wells shall be developed, surveyed, and gauged no later than December 1, 2020, and during each monitoring event. Defendant shall provide Plaintiffs no later than December 31, 2020 with gauging data showing measured groundwater elevations and estimated gradients.

24.     If the gauging data shows gradients are southeasterly rather than south/southwesterly at any time during the monitoring period, meaning that groundwater from the Production Area or the Application Fields may not be intercepted by the newly installed monitoring wells, then Defendant shall install up to two (2) additional wells ("Contingent Wells") in the approximate locations shown in the Groundwater Monitoring Plan (Exhibit 4).

25.     In the event that Defendant installs Contingent Wells, they shall be installed, developed, surveyed and gauged no later than the next quarterly sampling period following determination of their need. This schedule assumes that applicable County permits can be obtained in a

**CONSENT DECREE** - 12

timely manner for the southeasterly Contingent Well, which will be located on the right-of-way for Independence Road; if such permits are not granted in a timely manner, the Parties agree that this deadline shall be extended appropriately.

26.    Plaintiffs shall be permitted to observe installation of all monitoring wells under this Section, in accordance with Section L below (Site Inspections).

27.    Beginning after installation of the new wells, Defendant shall conduct four quarterly sampling events of all of its monitoring wells (in March, June, September, and December of 2021). Such quarterly sampling shall test for nutrients, conventional parameters, cations and anions as described in the Monitoring Well Installation and Groundwater Monitoring Plan (Exhibit 4).

28.    As described in Exhibit 4, following the four quarterly sampling events in 2021, Defendant shall conduct semi-annual (i.e., twice per year) sampling events (in June and December) from 2022 through, at least, 2028.

29.    Semi-annual sampling shall test for the following two parameters: nitrate and phosphorus. However, if other nutrients exceed the following trigger values during any of the previous sampling events, then the additional sampling described below shall be conducted:

a.    If ammonia-nitrogen or nitrite-nitrogen is detected above the method reporting limit in a well, the well(s) in which it was detected above the reporting limit shall be sampled for the detected parameter(s) for the next four sampling events.

**CONSENT DECREE** - 13

b.     If average phosphorus values from the prior four sampling events exceed 0.06 mg/L or if individual phosphorus values exceed 0.1 mg/L in a well, the well(s) in which it was detected above reporting limit shall be sampled for phosphorus for the next four sampling events. The trigger values for phosphorus do not apply to a well(s) screened across a layer of volcanic ash or other phosphorus-rich soil, provided that the presence of such ash or soil is documented to Plaintiffs at the time of well installation.

30.     Defendant's obligations to monitor its newly installed wells for nitrate pursuant to Paragraph 29(a) shall conclude after the monitoring event in the fourth quarter of 2028, except in the event that the maximum contaminant level for nitrate of 10 mg $NO_3$-N/L ("Nitrate MCL") is exceeded during the four prior sampling events, in which case Defendant shall continue to conduct twice-per-year nitrate monitoring in any well that so exceeded the Nitrate MCL.  Defendant shall terminate any such additional nitrate monitoring in any well that required the additional nitrate monitoring following two years (i.e., four sampling events) of consecutive semi-annual measurements below the Nitrate MCL.

31.     Defendant's obligations to monitor its newly installed wells for phosphorus pursuant to Paragraph 29(b) shall conclude after the fourth quarter of 2028, except in the event that the trigger levels listed in Paragraph 29(b) are exceeded during the four prior sampling events, in which case Defendant shall conduct twice-per-year phosphorus monitoring in any well that so exceeded the trigger levels.  Defendant shall terminate any such additional phosphorus monitoring in any well that required the

**CONSENT DECREE** - 14

additional phosphorus monitoring following two years (i.e., four sampling events) of consecutive semi-annual measurements below the trigger levels.

32.     Within 60 days after Defendant collects samples from monitoring wells pursuant to this Section C, Defendant shall provide Plaintiffs pursuant the Notice provisions in Paragraph 96 below with a transmittal letter and copy of the deliverables that Defendant receives from the laboratory concerning those samples.  The transmittal letter shall include a map of measured groundwater elevations and a map of nitrate results, and a full data table (of all sampled parameters for current and prior sampling events conducted pursuant to this Section).  Each transmittal letter shall also be accompanied with an electronic data table in .xls or .xlsx format.

33.     The transmittal letter accompanying the copy of laboratory deliverables that Defendant obtains after the fourth quarter of sampling in 2021 described above in Paragraph 27 shall summarize and compare the ammonia, nitrite, and phosphorus results from that fourth quarter sampling event and the previous three quarters of results to the trigger values for ammonia-nitrogen, nitrite-nitrogen, and phosphorus listed in Paragraph 29(a)-(b).

### D.     Stormwater Engineering

34.     Attached hereto as Exhibit 5 is Defendant's Stormwater Engineering Plan.

35.     Defendant shall complete the installation of improvements identified in Exhibit 5 no later than December 31, 2021.

36.     Plaintiffs shall be permitted to observe replacement of the

**CONSENT DECREE** - 15

earthen catch basin at the Little Dairy with a concrete vault or lined catch basin, in accordance with Section L below (Site Inspections).

### E.    Cow Pen Maintenance

37.    Attached as Exhibit 6 is Defendant's Cow Pen Maintenance Plan.

38.    Defendant shall apply the maintenance standards in Exhibit 6 to the cow pens currently in place at the Dairy, and to any pens that Defendant adds to the Dairy in the future.

39.    Defendant shall not be required to quantify or weigh the specific quantities of manure it removes from the cow pens, provided that the manure is moved appropriately to the compost areas in accordance with Exhibit 6.

### F.    Silage Areas

40.    Defendant shall collect and route to a lined manure storage lagoon all stormwater and silage liquids collected from the silage area shown on Exhibit 7 (Silage Area Drainage Improvements).

41.    Defendant is permitted to continue using compacted and graded soil or asphalt surfaces at the Dairy for silage storage.  No additional areas shall be used at the Dairy for silage storage unless the underlying soils are compacted to 95% compaction, slopes are a minimum of 2 percent and drainage for stormwater and collected leachate is provided, with that drainage discharged directly to the lagoon system.

a.    Prior to September 30, 2022, Defendant shall install lined collection ditches or strip drains at approximately the locations depicted in Exhibit 7 in order to collect stormwater and other liquids

**CONSENT DECREE** - 16

generated in the silage areas.

       b.    If Defendant installs collection ditches instead of drain piping, such ditches will be lined with a low-permeability material such as HDPE liner, concrete, or asphalt.

       c.    Defendant shall convey the liquids collected in the installed collection ditches or strip drains to lined sumps or catch basins via lined ditches or piped conveyances directly to manure storage lagoons.

42.    Once Defendant completes the activities Paragraphs 40-41, Defendant shall submit to Plaintiffs in accordance with the Notice provisions in Paragraph 96 a written description prepared by a licensed engineer of the activities Defendant undertook pursuant to Paragraphs 40-41.

43.    After Plaintiffs' receipt of the written descriptions required by Paragraph 42, Plaintiffs shall be permitted to inspect Defendant's activities with respect to the silage improvements, in accordance with Section L (Site Inspections).

## G.    Compost Areas

44.    No later than September 30, 2021, Defendant shall perform soil proctor and compaction testing throughout its two compost areas shown on the Compost Operations Plan attached as Exhibit 9.

45.    Defendant is permitted to continue using compacted and graded soil surfaces at the Dairy for compost operations and storage. Prior to September 30, 2022, Defendant shall install lined collection ditches or strip drains at approximately the locations depicted in Exhibit 8A (Upper Compost Area Improvements) and Exhibit 8B Lower Compost Area

**CONSENT DECREE** - 17

Improvements) in order to collect stormwater and other liquids generated in the compost areas.

46.     Compaction testing shall be performed on a grid (four (4) locations per acre).  Areas not meeting 95% compaction shall be re-compacted and retested.

47.     Re-compaction, if required, of the two compost areas shall be completed no later than September 30, 2023.

48.     Defendant shall maintain a minimum 2% grade in the compost areas toward the drainage swales.

49.     Once completed, Defendant shall submit to Plaintiffs in accordance with the Notice provisions in Paragraph 96 a written description prepared by a licensed engineer of the activities Defendant undertook pursuant to Exhibits 8A, 8B, and 9.

50.     After Plaintiffs' receipt of the written descriptions required by Paragraph 49, Plaintiffs shall be permitted to inspect Defendant's activities with respect to recompaction, in accordance with Section L (Site Inspections).

51.     Defendant shall adhere, at a minimum, to the composting procedures as further described in the Compost Operations Plan attached as Exhibit 9.

### H.     Wet Manure Storage Area

52.     Defendant shall minimize potential water generation within the compost areas associated with initial placement of wet separator solids.

53.     Defendant has already purchased mechanical dewatering equipment to remove free-draining water from separator solids.  Defendant

CONSENT DECREE - 18

has already applied for relevant permits to install such equipment at the Dairy.  Defendant shall install and operate such equipment by August 15, 2020, or as soon as practicable thereafter subject to permit issuance from Yakima County.  Once the equipment is operational, Defendant shall store the wastewater that it removes from separator solids as a result of operating this equipment in the Dairy's lagoons.

## I.    Manure Application and Field Management

54.    The provisions of this Section shall apply only to Application Fields owned, leased, or otherwise controlled by Defendant, including any Application Fields Defendant owns, leases, or otherwise controls after the Effective Date and during the term of this Decree.  All such Application Fields owned, leased, or otherwise controlled by Defendant shall be addressed in Defendant's DNMP.

55.    For purposes of this Decree, Defendant shall be deemed to "control" an Application Field to which manure is applied when (a) the manure is applied by Defendant's employees or Defendant's contractors using Defendant's or Defendant's contractor's trucks or application equipment; (b) when the amounts/rates of application are not dictated by the recipient; and (c) when Defendant is not meaningfully compensated for such manure.  For purposes of this subparagraph, reimbursement for fuel costs is not considered meaningful compensation.

56.    With respect to nitrogen, Defendant shall adhere to the following beginning in the Fall of 2021:

a.    Defendant shall make nitrogen applications at or below agronomic rates based on Application Field-specific nutrient management

**CONSENT DECREE** - 19

budgets prepared by an agronomist.

b.      No later than January 31, 2025, Defendant shall have its agronomist conduct a retroactive review of its agronomic rate calculations and field nutrient performance data for crop years 2021-2024 and document that review in a report ("Agronomic Rate Report"). This review shall assess whether taken as a whole the agronomic rate calculations have adequately projected nutrient utilization within the bounds of good agronomic practice with the parallel goal of minimizing leaching potential to groundwater.

c.      Defendant's agronomist's review of nutrient utilization shall include the mineralization of residual soil nitrogen, the availability of nitrogen from applied manure, the extraction of nitrogen by crops and the status and trends of residual nitrogen in the Application Fields.

d.      In the event that Defendant's management of manure in crop years 2021-2024 has followed its agronomist's recommendations based on agronomic rate calculations, evidence requiring adjustments to the agronomic rate calculations shall include excessive amounts of residual soil nitrogen (greater than 15 ppm) occurring consistently in some application fields or failure to reach 15 ppm in twenty-five percent (25%) or more of Defendant's Application Fields.

e.      Defendant shall submit to Plaintiffs in accordance with the Notice provisions in Paragraph 96 a draft of the Agronomic Rate Report for Plaintiffs' review and comment no later than January 31, 2025. Defendant shall consider any comments Plaintiffs submit to Defendant on the draft Agronomic Rate Report if Plaintiffs deliver such comments to

**CONSENT DECREE** - 20

Defendants in accordance with the Notice provisions in Paragraph 96 below no later than 45 calendar days after Defendant provides Plaintiffs with the draft Agronomic Rate Report.  Defendant shall finalize the Agronomic Rate Report no later than April 15, 2025, and send a copy to Plaintiffs upon completion in accordance with the notice provisions in Section U.  If the conclusions of the finalized Agronomic Rate Report indicate a need to adjust the agronomic rate calculation assumptions, such conclusions shall be implemented by Defendant beginning with crop year 2025 summer crop and through the termination of this Decree.

       f.     Defendant shall restrict its manure application in the manner described in the following Table 1:

### Table 1. Manure Application Restrictions for Nitrogen Control

| Fall Average Residual N in Upper 2 feet ($NH_4$-N+$NO_3$-N) | Nitrogen Application Restrictions Based on Measured Fall Average Residual Soil Nitrogen Levels ($NH_4$-N+$NO_3$-N) | | | | Split Application Schedule for Manure Applied by Irrigation (Crop Year 2025+ Only) | |
|---|---|---|---|---|---|---|
| | Crop Year 2022 (Fall 2021) | Crop Year 2023 (Fall 2022) | Crop Year 2024 (Fall 2023) | Crop Year 2025+ (Fall 2024) | Portion of winter crop application made in fall (Oct-T200) | Portion of winter crop application made in spring (After T200) |
| $\leq$ 15 mg N/kg | 100% of agronomic rate | 100% of agronomic rate | 100% of agronomic rate | 100% of agronomic rate | $\leq$ 100% | Balance |
| 15.1-25 mg N/kg | 100% of agronomic rate | 100% of agronomic rate | 95% of agronomic rate | 90% of agronomic rate | $\leq$ 66% | Balance |
| 25.1-35 mg N/kg | 95% of agronomic rate | 85% of agronomic rate | 80% of agronomic rate | 75% of agronomic rate | $\leq$ 33% | Balance |
| 35.1-45 mg N/kg | 90% of agronomic rate | 80% of agronomic rate | 70% of agronomic rate | 60% of agronomic rate | 0% | Balance |
| > 45 mg N/kg | No application | No application | No application | No application | — | — |

**CONSENT DECREE** - 21

g.      For purposes of interpreting Table 1:

i.      Nitrogen agronomic rate limitation shall apply to both the winter and summer crop, unless follow-up soil nitrogen measurements fall into a lower category, or crop tissue (basal stem and leaf sampling) measurements show a deficiency in the crop tissue for nitrogen.

ii.     For crop year 2025 and thereafter, winter manure applications will be split into a fall and early spring application as indicated in Table 1 for fields to which manure is applied by irrigation.

iii.    If a given Application Field exceeds 25 mg N/kg for three (3) years in a row after crop year 2025, then Defendant shall reduce the application limit for that field from 75% to 50% until the nitrogen level drops below 15 mg N/kg.

iv.     If a given Application Field exceeds 35 mg N/kg for two (2) years in a row after crop year 2025, then Defendant shall apply no manure to that field until the nitrogen level drops below 15 mg N/kg.

h.      Nitrogen levels used to determine compliance with Table 1 shall be measured by the average of nitrate-nitrogen plus ammonium-nitrogen in each of the top two feet of the soil column based on Fall post-harvest sampling results.

i.      Agronomic rate adjustments shown in Table 1 shall be applied after completing the standard agronomic rate calculation. For example, if a standard agronomic rate calculation indicates a need for 2.0 million gallons of manure, and if the restricted rate in Table 1 is "90 percent of agronomic rate", then the maximum manure application for that Application Field will be 1.8 million gallons (2.0 million gallons x 90% =

**CONSENT DECREE** - 22

1.8 million gallons).

j.      For the Application Fields to which Defendant applies manure via irrigation or blending, Defendant shall split the winter manure application into a fall and early spring application. The amount of the split shall be adjusted based on Fall residual soil nitrogen level as indicated in Table 1 for crop year 2025 and beyond. Split winter applications are not required for Defendant's Application Fields which Defendant uses for injection.

57.      With respect to phosphorus, Defendant shall adhere to the following beginning on the Effective Date:

a.      Defendant shall measure available phosphorus at the 0-1-foot and 1-2-foot levels in its Application Fields in parallel with fall soil nitrogen testing.

b.      Defendant shall maintain its Application Fields in the low-risk category as measured using the current NRCS approved phosphorus index procedures.

c.      Defendant shall maintain phosphorus levels in its feed ration at a level less than 0.4% phosphorus measured on a total ration dry matter basis.

d.      Sunnyside shall continue physical manure solids separation using a manure centrifuge or other equivalent methods for enhanced solids recovery, as well as composting and exports to reduce on-Dairy applications of manure and wastewater.

58.      With respect to phosphorus, in addition to the requirements in Paragraph 57, and beginning in the crop season that commences after

CONSENT DECREE - 23

Defendant's Fall 2026 post-harvest sampling, Defendant shall restrict its manure application in the manner described in the following Table 2:

**Table 2. Manure Application Restrictions for Phosphorus Control**

| Fall Average Available P in Upper 2 feet (mg Olsen P/kg) | Total annual application based on P (Crop Year 2027+) |
|---|---|
| < 40 mg P/kg | Control for N |
| 41-100 mg P/kg | 90% of crop extraction |
| 101-180 mg P/kg | 80% of crop extraction |
| 181-300 mg P/kg | 25% of crop extraction |
| > 300 mg P/kg | No application |

      a.     Defendant shall apply the requirements in Table 2 to each of its Application Fields based on the average fall post-harvest measurements of available phosphorus measured in the top 2 feet of the soil column in each Application Field.

      b.     Defendant shall adhere to the requirements in Table 2 during the crop year following the Fall compliance measurements or until resampling has shown that the requirements in Table 2 are no longer required (e.g., an Application Field measuring 45 ppm P in fall is retested in spring and measures 38 ppm P).

      c.     Based on the Fall available phosphorus measurements, the requirements in Table 2 shall be implemented and followed for the duration of the Consent Decree.

      d.     For purposes of Table 2, phosphorus extraction rate limitation shall apply to the full crop year, unless follow-up soil available phosphorus measurements fall into a lower category.

      e.     The annual limits on phosphorus application listed in Table 2 are expressed as a function of the estimated annual phosphorus

**CONSENT DECREE** - 24

extraction rate of the crops (extraction rate = tons crop/acre x P content/ton crop) grown on each field during the crop year. The annual application amount will be based on the fall available P levels and will be split in most cases into multiple applications, with the total annual amount applied limited to the Table 2 values.

59.    Defendant shall implement a soil moisture monitoring program at the Application Fields in accordance with the following requirements:

a.    For purposes of this paragraph, a "Soil Moisture Monitoring Period" begins two weeks prior to Defendant's first irrigation or manure application event in each Application Field through at least two weeks after Defendant's final irrigation or manure application event in each field.  During most years, the Soil Moisture Monitoring Period will extend from mid-March through early November.

b.    During the Soil Moisture Monitoring Periods in 2021, 2022 and 2023 (the "Three Year Test Period"), Defendant shall install and operate a set of irrigation sensors to monitor soil moisture levels in eight (8) representative Application Fields as illustrated in Exhibits 2a-c.  For Application Fields that contain soils with significantly different nitrate leaching potential or water holding capacity, as indicated by the Natural Resources Conservation Service ("NRCS"), Defendant shall deploy and operate soil moisture sensors in each of two representative soil series. The locations of the soil moisture sensors are shown on the maps attached hereto as Exhibit 10.

c.    Defendant shall install sensors in each location at the

**CONSENT DECREE** - 25

following three approximate depths (variable by +/- two inches): 0.5-foot, 1.5-feet and 2.5-feet. If rocky or indurated soil properties in any location preclude effective placement of the 2.5-foot sensor after three independent boring attempts, Defendant shall not be required to install the 2.5-foot sensor in that location(s), but shall document for each of those location(s) the total depth of soil to the point of boring refusal.

d.      To verify field capacity estimates, Defendant shall calibrate sensors at the time of installation using a gravimetric sample approach where soil water is measured on a weight basis. Soil bulk density measurements used in calibration shall be confirmed for each sensor location at each depth. Calibration shall be reported in the first Annual Report (described in Paragraph 59(h) below) along with Application Field capacity estimates for each monitoring location at each depth.

e.      Defendant shall calibrate any replacement sensors in a similar manner as in Paragraph 59(d), and these calibrations shall be reported in the Annual Report (described in Paragraph 59(h) below) for the year in which the sensors were replaced. Defendant shall have at least two (2) replacement sensors available at the Dairy in case of failure of installed sensors.

f.      Defendant shall use best efforts to maintain the sensors in an operational condition throughout the Soil Moisture Monitoring Period. Defendant shall implement necessary maintenance, repairs or replacement of the sensors with the goal of minimizing operational down-times to twenty-one (21) days for the two shallowest depths and fifteen (15) days for the sensors at 2.5 feet.

**CONSENT DECREE** - 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

g.      During the Three Year Test Period, Defendant shall use the soil moisture sensors to validate and, if necessary, adjust its irrigation rates to meet crop needs while minimizing exceedances of Application Field capacity in the 2.5-feet soil level as follows:

i.      Defendant shall continue its practice of obtaining weekly irrigation needs estimates from an agronomist using the Evapotranspiration method.

ii.      Defendant shall irrigate its Application Fields consistent with the recommended values unless soil moisture sensors indicate an exceedance of field capacity at the 2.5-feet level.

iii.      If soil sensors from the prior week indicate exceedances of Application Field capacity at the 2.5-feet level, Defendant shall adjust the recommendation for future irrigation rates downward from what would otherwise be provided using the Evapotranspiration method, with the goal of decreasing and maintaining soil moisture levels below field capacity at the 2.5 feet level. Defendant shall track both the original and any adjusted recommendations on a weekly basis throughout the Three Year Test Period.

iv.      For the first two fields with an irrigation-related exceedance of Application Field capacity at the 2.5 feet level during the Three Year Test Period, Defendant's Fall soil monitoring shall include a one-time sampling on each such Application Field that shall extend to the 5-feet depth in that Application Field (or to the depth of refusal).  For each sample, Defendant shall analyze at 3 feet, 4 feet, and 5 feet for ammonia-N and nitrate-N and Olsen P.  The resulting sampling data shall be provided

**CONSENT DECREE** - 27

to Plaintiffs consistent with the Notice provisions in Paragraph 96.

h.      No later than February 28 in the year after the end of each Soil Moisture Monitoring Period during the Three Year Test Period (i.e., for the 2021 Soil Moisture Monitoring Period, this date would fall on February 28, 2022), Defendant shall provide Plaintiffs pursuant to the Notice provisions in Paragraph 96 with an Annual Report containing Defendant's initial and adjusted weekly recommendations and the monitoring data for each soil moisture sensor in tabular format. Monitoring data provided for each sensor location shall consist of a complete digital file (.xlsx, .xls, or .csv) and a graphical readout showing measured moisture levels for the 0.5-foot, 1.5-feet and 2.5-feet sensors throughout each Soil Moisture Monitoring Period, with notes summarizing any encountered sensor performance issues, any completed repairs, and notes documenting the dates, amounts, and rates (gallons/acre) of irrigation water and manure applications in the Application Field where the sensor is located. Defendant shall also provide in the Annual Report local daily precipitation data for the year using publicly-available weather data from the nearest reliable weather station.

i.      If during the 2023 Soil Moisture Monitoring Period the moisture sensor readings show a pattern of ongoing irrigation-related exceedances of field capacity at the 2.5-feet depth (i.e., three or more exceedances, not counting exceedances immediately following precipitation events), then Defendant shall maintain moisture sensors in the Application Field where such sensor exceedances were reported until no more than one (1) exceedance is recorded in that field during the Soil

**CONSENT DECREE** - 28

Moisture Monitoring Period.

60.    Beginning on the Effective Date, Defendant shall for the duration of this Decree maintain application records of (a) any manure it hauls to and applies to an Application Field; and (b) any manure it applies to Application Fields through irrigation or blending.  Such records shall include the Application Field ID; the manure quantity (volume); characteristics (blended or straight); date of application; and a link to the manure nutrient testing information. Defendant shall keep separate application records in the event it conducts multiple applications on different days.

61.    No later than January 31 of each year beginning in 2021 and for each year for the duration of the Consent Decree, Defendant shall provide to Plaintiffs PDF copies of manure management records for the prior crop year via electronic mail (at the addresses listed in Paragraph 96). Records that Defendant shall provide pursuant to this paragraph are listed in Exhibit 11.

62.    Any manure management records routinely generated by Defendant in compliance with its CAFO permit and similar regulatory requirements shall be kept on-site at the Dairy for five (5) years from the date of generation.  No more than once per calendar year, Plaintiffs shall have the right to request access to conduct an on-site review of the manure management records (pursuant to Section L) for which they have not been provided copies pursuant to Paragraph 61.

63.    Defendant shall use flow meters on all Application Fields to which it applies lagoon water through irrigation or blending.

**CONSENT DECREE** - 29

## J.    Underground Conveyance Inspections

64.    No later than December 31, 2023, Defendant shall inspect the wastewater and manure lines between the production areas, the lagoons, and the pivots (to the extent they are used for liquid manure transportation) at the Upper, Lower and Little Dairies.  If the inspection shows that repairs need to be made in any of those lines, Defendant shall make the necessary repairs no later than December 31, 2023.

65.    Inspection and any required repair work shall be performed by an experienced and qualified contractor.

66.    Once inspection and any required repairs are completed, Defendant shall submit to Plaintiffs in accordance with the Notice provisions in Paragraph 96 a written description of the activities Defendant undertook pursuant to this Section, which shall include documentation of the lines inspected and the location(s) of any repair(s) made.

## K.    Clean Drinking Water Project Funding

67.    The following funding mechanisms for the Clean Drinking Water Project ("CDWP") have been determined by the Parties based on Defendant's proactive stance with respect to its manure management practices and cooperative negotiations with Plaintiffs.

68.    In the years 2020 through and including 2024, Defendant shall make five annual $24,000 payments (for a total of $120,000) to the CDWP. Payments shall be made prior to December 31 of each year.  The first payment shall be made no later than December 31, 2020 and the final payment shall be made no later than December 31, 2024.

69.    Between 2025 and 2028, Defendant shall make five annual

**CONSENT DECREE** - 30

payments to the CDWP of up to $24,000 per year based on the number of new on-site, downgradient groundwater monitoring wells exceeding the Nitrate MCL.  The amount of each annual payment between 2025 and 2028 shall be equal to the percentage (rounded to the nearest full percent) of the new groundwater wells that exceed the nitrate MCL in the prior monitoring year (e.g., if 3 of 7 groundwater wells exceeded the Nitrate MCL during 2024, the annual payment for 2025 would be $10,320 [3/7, or 43% multiplied by $24,000]). Payments shall be made prior to December 31 of each year between 2025 and 2028.

70.     No later than March 31, 2029, Defendant shall make a final one-time payment to the CDWP equal to 3-times the payment it made in 2028 pursuant to Paragraph 69.

71.     All aspects of the Clean Drinking Water Project shall be managed by the CDWP.  Defendant's sole obligation with respect to this Section or the Clean Drinking Water Project is to provide the funding described in this Section.

72.     For each year in which Defendant makes a payment pursuant to Section K, Plaintiffs shall submit to Defendant in accordance with the Notice provisions in Paragraph 96 a written description of the activities the CDWP undertook pursuant to Section K.  The written description shall be provided annually by Plaintiffs no later than March 31 of the year following each annual payment (i.e., by March 31, 2021 for the payment made in 2020).  The written description shall include but is not limited to:

a.     Results of drinking water nitrate testing performed during that year by Plaintiffs at households within the radius illustrated on

**CONSENT DECREE** - 31

Exhibit 12 (i.e., three miles downgradient of the Dairy).

b.    Addresses of households within the radius illustrated on Exhibit 12 that were provided with installation or maintenance of clean drinking water systems (e.g., reverse osmosis systems) or bottled water by the Clean Drinking Water Project during the year. If any household(s) choose to keep confidential that they were provided with installation or maintenance of a clean drinking water system, then the written description shall include how many of these households have so chosen, along with the addresses and results from the other households.

## L.    Site Inspections

73.    Pursuant to the above Section B (Manure Storage Lagoons and Overflow Basins), Section C (Groundwater Well Installation and Monitoring), Section D (Stormwater, Piping, and Engineering Plan), Section F (Silage Area), Section G (Compost Area), and Section I (Manure Application and Management) relating to Plaintiffs' observation and/or inspection of activities at the Dairy, the following provisions shall apply:

74.    For each activity Plaintiffs are permitted to observe and/or inspect, Plaintiffs may have up to three representatives present at the Dairy during such observation or inspection.

75.    Plaintiffs' representatives are permitted upon the Dairy solely to observe and inspect the activities provided.

76.    Plaintiffs' representatives shall have applicable scientific or professional qualifications to be able to confirm compliance with this Decree.

77.    At least 48 hours prior to any such observation and inspection,

**CONSENT DECREE** - 32

Plaintiffs shall provide Defendant written notice of their intent to observe and inspect the Dairy, identifying the Section of this Decree on which they are relying to accomplish such observation or inspection.  Such notice shall include the names of the proposed observers/inspectors, a description of their qualifications, and the start and end times of the proposed period of observation/inspection (which shall not be before 8:00 AM or after 5:00 PM, respectively).

78.    The representatives may not remain on the Dairy outside of business hours and must be accompanied by a representative of Defendant at all times (including travel onto and off the Dairy).

### M.    Fees and Costs

79.    Plaintiffs claim the right to recover reasonable attorneys and expert witness fees under RCRA. Without admitting any facts, law, or status as prevailing party, after determining the hours expended in preparation and prosecution of this litigation and the anticipated costs of the oversight of implementation of this Consent Decree, Defendant and Plaintiffs agree that the sum of $103,500, will be paid to the Law Offices of Charles M. Tebbutt, P.C., 941 Lawrence St., Eugene OR 97401, Attention: Charles M. Tebbutt, within sixty (60) days of entry of this Decree in full and complete satisfaction of an award of such costs and fees.

80.    Defendant shall reimburse Plaintiffs for costs documented by Plaintiffs that are necessary to monitor implementation of this Decree ("Monitoring Costs") up to the following maximum amounts, subject to the terms in Paragraph 80(a)-(c) below:

- 2020:        $25,000

**CONSENT DECREE** - 33

- 2021:        $55,000
- 2022:        $50,000
- 2023:        $40,000
- 2024:        $30,000
- 2025-2028:  $25,000 per year

a.      The Parties shall use best efforts to minimize Plaintiffs' Monitoring Costs.  For instance, the Parties shall maintain open communication with each other in order to minimize the Monitoring Costs; Defendant shall provide required documentation in a timely manner to Plaintiffs; and Plaintiffs shall attempt to bundle activities and associated site visits where possible.

b.      No later than February 15 of each year from 2021 through and including 2029, Plaintiffs shall submit a single package of invoices to Defendant that document Plaintiffs' Monitoring Costs for the prior year.  The invoices shall provide a brief narrative describing the work Plaintiffs performed and an itemization of associated Monitoring Costs. Defendant shall have 30 calendar days to review invoices and identify any disputed Monitoring Costs for discussion with Plaintiffs.  Undisputed Monitoring Costs shall be paid within 60 calendar days of Defendant's receipt of the invoice(s) reflecting the undisputed Monitoring Costs. Disputed Monitoring Costs shall be subject to the Dispute Resolution provisions of Section S.

c.      No later than December 1, 2021, the Parties shall evaluate Monitoring Costs incurred by Plaintiffs in 2020 and for the first eleven (11) months of 2021, and shall discuss ways to minimize Monitoring Costs beginning in 2022 based on their experiences to date.

**CONSENT DECREE** - 34

### N.    Other Terms and Conditions

81.    This Consent Decree is intended to be and shall constitute the exclusive remedy and final resolution between Plaintiffs and their members, officers, and directors, and Defendant for all alleged violations of the RCRA and all issues as set forth in the Complaint and/or 90-Day Notice filed in this case that may have occurred or that could have been raised prior to the entry of this Decree.

82.    This Decree constitutes a full, final and complete settlement of all claims, rights, demands, and causes of action for alleged violations of RCRA that Plaintiffs asserted, or could have asserted in the Complaint and the 90-Day Notice filed in this case.

83.    Neither Plaintiffs, including any person(s) or entity acting with, by or through Plaintiffs, in either their own or in any representative capacity, nor any of Plaintiffs' members, officers or directors, shall file or cause to be filed or intervene in any enforcement lawsuit in any court with respect to matters arising from the allegations set forth in the 90-Day Notice and Complaint in this matter.

84.    Each Party acknowledges and represents that they have relied on the legal advice of their attorney, who is the attorney of their own choice and that the terms of this Decree have been completely read and explained to them by their attorney, and that the terms are fully understood and voluntarily accepted. Plaintiffs has been represented by Charles M. Tebbutt of Law Offices of Charles M. Tebbutt, P.C.  Defendant has been represented by Meredith Weinberg and Patrick Ryan of Perkins Coie, LLP.

85.    Each Plaintiff shall act as a single legal entity with respect to

**CONSENT DECREE** - 35

all notices, decisions and other actions taken under this Decree.  Defendant shall not be answerable to individual members of each Plaintiff in complying with this Decree.  Plaintiffs' counsel shall act as representative for all Plaintiffs with respect to all notices, decisions and other actions taken under this Decree.

86.    If for any reason the Court should decline to approve this Decree in the form presented, the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the court to entry of this Decree.

87.    Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

88.    Prior to the date on which the Parties jointly file a motion to enter this Decree, Plaintiffs and Defendant shall have work together to draft a mutually agreeable press release (the "Press Release") announcing certain terms of this Decree. Promptly upon jointly filing a motion to enter this Decree, Plaintiffs and Defendant shall issue the Press Release. Prior to the issuance of the Press Release and subject to the terms of this Decree, neither Plaintiffs nor Defendant shall issue any press release or make any public announcement regarding this Decree or the matters contemplated hereby without the prior written consent of the other Party.

## O.    Release and Covenant Not to Sue

89.    In further consideration of the commitments that Defendant made in this Decree, Plaintiffs release, discharge, covenant not to sue, and agree not assert any claims or causes of action against Defendant or its

**CONSENT DECREE** - 36

directors, officers, employees and affiliated entities and persons with respect to all matters arising from the allegations set forth in the Complaint and 90-Day Notice. This release and covenant not to sue include all claims or causes of action, whether known or unknown, whether under state or federal law, and whether asserted or unasserted, and specifically include, but are not limited to, claims for civil penalties, attorneys' fees and costs, expert witness fees, injunctive relief, and damages for nuisance, trespass or other common-law claims arising from the allegations set forth in the Complaint and 90-Day Notice. This release and covenant not to sue do not apply to any of Defendant's future acts or omissions arising independently and separately from the terms of this Decree, and do not release Defendant from compliance with this Decree.

## P.  **Force Majeure**

90.    Defendant's obligation to comply with the requirements of this Decree shall be deferred or modified to the extent caused by *force majeure*. *Force majeure*, for purposes of this Decree, is defined as any event arising from causes beyond the control of Defendant, that delays or prevents the performance of any obligation required by this Decree, despite Defendant's best efforts to comply with this Decree. *Force majeure* includes, but is not limited to:

a.    Delays caused by government agencies, including but not limited to Yakima County and the Department of Ecology, in reviewing, approving or modifying documents submitted by Defendant.

b.    Delays caused by third parties that prevent the Dairy from securing necessary supplies, materials, materials, or products.

**CONSENT DECREE** - 37

c.      Delays caused by the failure of Plaintiffs or their consultants in fulfilling their obligations under this Decree.

d.      Delays necessitated by circumstances that pose an imminent threat to public health, safety or the environment.

e.      The intentional acts or omissions of third parties that cause injury or damage to the Dairy or its operations.

f.      Government acts, legislation, orders, or regulations affecting Dairy Operations that affirmatively prohibit any agreed-upon action required by this Decree.

g.      Acts of God, including fire, flood, extreme weather conditions, catastrophic equipment failure, public health emergencies, or other unavoidable casualties.

h.      Delays necessitated by circumstances relating to the COVID-19 pandemic.

91.    Delays caused by any *force majeure* acts shall be documented by Defendant and an explanation shall be provided to Plaintiffs' representatives within fourteen (14) business days of the condition giving rise to the act alleged to be *force majeure*, pursuant to the Notice provisions in Paragraph 96 below.

### Q.    <u>Integration</u>

92.    This Decree constitutes the final, complete and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Decree and the subject matter of this action. The Parties acknowledge that there are no representations or understandings relating to this action and settlement other than those expressly contained in this

**CONSENT DECREE** - 38

Decree.

### R.    <u>Modification</u>

93.    This Decree may not be modified by the Parties except by written amendment signed by the Parties and shall be effective upon approval by the Court.

### S.    <u>Retention of Jurisdiction and Dispute Resolution</u>

94.    The Court shall retain jurisdiction over this matter for the purpose of interpreting and enforcing the terms of the Decree.  In the event of any dispute regarding implementation of or compliance with the Decree, the Parties shall first attempt to informally resolve the dispute through meetings between the Parties. Any Party may initiate informal dispute resolution by serving Notice of a request for dispute resolution pursuant to Paragraph 96 of this Decree. If no resolution is reached within thirty (30) days from the date that the notice of dispute is served, the Parties may resolve the dispute by filing motions with the Court.

### T.    <u>Termination</u>

95.    This Decree and the obligations set forth herein shall terminate on December 31, 2028, except in the event that the annual groundwater monitoring obligations in Paragraph 30 or Paragraph 31 are triggered.  If the annual groundwater monitoring obligations in Paragraph 30 or Paragraph 31 are triggered, all obligations set forth in this Decree other than those in Paragraph 30 or Paragraph 31 shall terminate on December 31, 2028, and the Decree and the remaining Paragraph 30 or Paragraph 31 obligations shall terminate upon Defendant's completion of the requirements in Paragraph 30 or Paragraph 31.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## U.    <u>Notice</u>

96.    Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Decree, it will be directed to the individuals at the addresses specified below, unless prior notice of a change has been given to the other Party. A notice shall be deemed sufficient under this Decree if it is provided in writing through the U.S. mail/Federal Express/UPS, hand-delivered, or provided electronically by e-mail. In the event that a notice is provided by U.S. mail/ Federal Express/UPS, it shall be considered effective upon receipt. This paragraph shall also apply to any payments made under this Decree, unless otherwise provided under this Decree.

<u>As to Plaintiffs:</u>
Charles M. Tebbutt, Esq.
B. Parker Jones, Esq.
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence Street
Eugene, OR 97401
charlie@tebbuttlaw.com
parker@tebbuttlaw.com

<u>As to Defendant:</u>
Rosalio Brambila
Sunnyside Dairy, LLC
4581 Maple Grove Road
Sunnyside, WA  98944
rosalio@sunnysidedairy.com

AND

Meredith Weinberg
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101

**CONSENT DECREE** - 40

mweinberg@perkinscoie.com

## V.    <u>**Effective Date and Final Judgment**</u>

97.    This Decree shall constitute a final non-appealable judgment in this action and shall take effect on the day it is entered by the Court. The Court shall retain jurisdiction to enforce the terms of this Decree and to resolve any disputes arising hereunder until the Decree has been terminated in accordance with Paragraph 95 of this Decree.


WE HEREBY CONSENT to the entry of this Consent Decree.

**IT IS SO ORDERED**: Dated and entered September 17, 2020<u>.</u>



Thomas O. Rice
United States District Judge

**COMMUNITY ASSOCIATION FOR THE RESTORATION OF THE ENVIRONMENT, INC.**

Signature:  [on file at ECF No. 2-1 at 41]

Name (print):

Title:

Date:


**FRIENDS OF TOPPENISH CREEK**

Signature:  [on file at ECF No. 2-1 at 42]

Name (print):

Title:

**CONSENT DECREE** - 41

Date:


**CENTER FOR FOOD SAFETY**

Signature:  [on file at ECF No. 2-1 at 43]

Name (print):

Title:

Date:


**SUNNYSIDE DAIRY, LLC**

Signature:  [on file at ECF No. 2-1 at 44]

Name (print):

Title:

Date:


**\*\*\*<u>EXHIBITS 1 THROUGH 13 ARE ON FILE HEREIN AND
FILED AT ECF NOS. 2-2 THROUGH 2-14 AND ARE HEREBY
INCORPORATED IN FULL BY THIS REFERENCE.  Signed
Thomas O. Rice, United States District Judge.</u>\*\*\***

**CONSENT DECREE** - 42